UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| BRADLEY D. FULLER, | CASE NO. 3:22-CV-00197-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Bradley D. Fuller filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 4, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry dated Feb. 4, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Fuller filed for DIB on November 17, 2020, alleging a disability onset date of November 23, 2019. (Tr. 244). He amended the disability onset date to June 7, 2019. (Tr. 251). His claims were denied initially on January 25, 2021, and on reconsideration on April 5, 2021.

(Tr. 88-97, 99-108). He then requested a hearing before an Administrative Law Judge. (Tr. 126-27). Mr. Fuller (represented by a non-attorney representative) and a vocational expert (VE) testified before the ALJ on August 4, 2021. (Tr. 35-62). On August 26, 2021, the ALJ issued a written decision finding Mr. Fuller not disabled. (Tr. 10-34). The Appeals Council denied Mr. Fuller's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Fuller timely filed this action on February 4, 2022. (ECF #1).

## FACTUAL BACKGROUND

### I.    PERSONAL AND VOCATIONAL EVIDENCE

Mr. Fuller was 39 years old on his alleged onset date, and 42 years old at the time of the administrative hearing. (Tr. 88). Mr. Fuller obtained an associate degree. (Tr. 41). In the past, Mr. Fuller has been employed as a claims clerk, a passport agent, and a loadmaster for the Navy. (Tr. 45).

### II.    RELEVANT MEDICAL EVIDENCE

Mr. Fuller receives pain management treatment for his low back pain. (*See* Tr. 505). In 2016, Mr. Fuller underwent a L5-S1 microdiscectomy that was intended to, and did, relieve the left leg and radicular symptoms. (Tr. 71). For continued back pain, the surgeon recommended exercise, activity modification, anti-inflammatories, and weight loss. (Tr. 72). Mr. Fuller received lumbar injections in 2018 and 2019 (Tr. 374), a left hip injection in January 2021 (Tr. 928), and a lumbar transforaminal epidural injection at left L5 and S1 in April 2021. (Tr. 1148).

After a series of medical appointments and emergency room visits for high fevers and painful, red, swollen ankles in December 2019 and January 2020 (*see* Tr. 354, 489, 528, 558), Mr.

Fuller met with Margaret Tsai, M.D., a rheumatologist, in February 2020 and was diagnosed with undifferentiated connective tissue disease/Still's disease, secondary osteoarthritis of multiple sites, and pain in the right wrist. (Tr. 618-19). On examination, Dr. Tsai noted a limited range of motion and joint tenderness in both ankles and feet, left hip, lumbar area, and right wrist, without swelling, clinical synovitis, or joint instability. (Tr. 617-18). Dr. Tsai prescribed prednisone and colchicine, which she noted may cause diarrhea. (Tr. 619). After Mr. Fuller called the doctor's office with continued pain, Dr. Tsai increased the dosage of prednisone and offered Voltaren gel. (Tr. 404-05).

On March 19, 2020, Mr. Fuller met with Dr. Tsai and reported less ankle pain with the higher dosage of prednisone and had started to taper off. (Tr. 406). Additionally, Mr. Fuller reported tolerating the colchicine twice a day with loose stools and notified Dr. Tsai of a history of irritable bowel syndrome (IBS). (*Id.*). Physical examination revealed tenderness in both ankles and feet, left hip, lumbar area, and right wrist, and decreased range of motion due to pain. (Tr. 408). Mr. Fuller reported a pain level of 5/10 and endorsed minimal morning stiffness. (Tr. 409). Dr. Tsai prescribed methotrexate and continued prednisone and colchicine. (Tr. 410). That same month, the pain management clinic increased Mr. Fuller's dosage of gabapentin. (Tr. 856).

In April 2020, Mr. Fuller met with gastroenterologist Sulieman Abdal Raheem, M.D., for a one-year follow up appointment. (Tr. 374). Mr. Fuller reported diarrhea all his life and five to six loose bowel movements daily. (*Id.*). Dr. Raheem advised Mr. Fuller to try Metamucil and return in one year. (Tr. 375).

Between April 2020 and August 2020, Dr. Tsai increased and decreased Mr. Fuller's prescriptions for prednisone depending on his symptoms, increased the dosage of methotrexate, and continued him on colchicine. (Tr. 425-26, 441, 444, 456).

On June 19, 2020, Mr. Fuller returned to the pain management clinic with back pain. (Tr. 507). He stated previous injections were not helpful. (*Id.*). Mr. Fuller endorsed improvement with gabapentin at 600 mg twice a day but also noted increased pain due to the decrease in his dosage of prednisone. (Tr. 508). He received an updated prescription for gabapentin 600 mg three times daily. (*Id.*).

On June 22, 2020, Mr. Fuller sent a message to Dr. Tsai indicating mild swelling in the hands and feet, and aching pain in his feet, toes, and wrists. (Tr. 448). Dr. Tsai prescribed an arthritis medication, Arava, and increased the dosage of prednisone. (Tr. 447).

On August 10, 2020, Mr. Fuller sent a message to Dr. Tsai indicating no change since starting Arava and reported aching and swelling in his wrists, making it difficult for him to perform simple tasks, such as typing the message to Dr. Tsai. (Tr. 460). Dr. Tsai noted the rheumatologic medications were intended to address swelling, not pain; she offered Humira, a biologic, if the Arava was not effective. (*Id.*). On August 27, 2020, Dr. Tsai continued the dosage for methotrexate, increased the dosage of Arava, and directed Mr. Fuller to taper down the prednisone if tolerated. (Tr. 468). On August 28, 2020, physical examination revealed joint tenderness in both ankles and feet, left hip, lumbar area, and right wrist, with decreased range of motion due to pain. (Tr. 464). Mr. Fuller also reported the Metamucil (fiber) was helping his gastrointestinal issues. (Tr. 467).

On September 25, 2020, Mr. Fuller returned to pain management with low back pain radiating down his left leg. (tr. 497). Mr. Fuller stated he could not tolerate the increased dosage of gabapentin and returned to taking 600 mg twice per day. (*Id.*). Mr. Fuller otherwise endorsed feeling fairly stable and did not want to make medication changes at that time. (Tr. 499). On December 18, 2020, Mr. Fuller returned to pain management with pain now going down into his foot and toes, rated 4-6/10 depending on activities. (Tr. 863). Mr. Fuller stated he feels okay if he does not do anything during the day, but the pain becomes intolerable with any physical activity. (*Id.*). He felt the gabapentin was helpful, but not helpful enough. (*Id.*).

In December 2020, Mr. Fuller messaged Dr. Tsai and reported increasing pain in his hands and feet and noted that "[m]inor tasks requiring fine motor skills (i.e., typing, cooking) have been severely affected." (Tr. 1011). Dr. Tsai noted Mr. Fuller had failed long-term steroids, methotrexate, and Arava, and prescribed Actemra. (Tr. 1012). Mr. Fuller's medical insurer denied the prescription and notified Dr. Tsai that Mr. Fuller would have to try and fail Humira first. (Tr. 909). In January 2021, Mr. Fuller was approved for use of Humira and began receiving injections every two weeks. (Tr. 904).

A lumbar spine MRI, dated January 6, 2021, showed post-surgical changes at L5-S1 on the left, some decrease in associated epidural contrast enhancement, and suggestions of residual or recurrent posterior disc herniation that was comparable to a prior imaging study. (Tr. 919).

In February 2021, Mr. Fuller met with his primary care physician, Elyse Tinker, D.O., with complaints of very vivid dreams about his military experience that haunt him all day and a loss of interest in things. (Tr. 941).

On February 18, 2021, Mr. Fuller returned to Dr. Tsai's office and reported taking two doses of Humira. (Tr. 1034). He noted having ten bowel movements a day from taking colchicine twice a day. (*Id.*). He displayed joint tenderness in both hands, both ankles and feet, left hip, lumbar area, and right wrist, with decreased range of motion due to pain. (Tr. 1037). Dr. Tsai maintained all prescriptions. (Tr. 1040). On February 21, 2021, Dr. Tsai told Mr. Fuller to cease taking methotrexate and Arava due to high liver function tests. (Tr. 1057). An EMG study of the lower extremities was normal. (Tr. 1144).

In May 2021, after Mr. Fuller's liver function tests improved, Dr. Tsai restarted Mr. Fuller's prescription for methotrexate, but advised Mr. Fuller to not restart Arava. (Tr. 1136).

On May 5, 2021, Mr. Fuller underwent a two-hour functional capacity assessment at Firelands Regional Medical Center with a physical therapist. (Tr. 1077). Musculoskeletal evaluation revealed moderately restricted range of movement with lumbar flexion and severe limitation to lumbar extension. (Tr. 1079). The physical therapist noted Mr. Fuller occasionally shifted in his seat and regularly repositioned himself due to pain. (*Id.*). Upper extremity strength testing revealed Mr. Fuller's mean grip strength was below the normative standards bilaterally for his age and gender. (Tr. 1085). On the Purdue Pegboard Test, designed to test fine motor coordination, Mr. Fuller scored in the zeroth percentile for the right hand and the 3rd percentile for the left hand. (*Id.*). The therapist noted Mr. Fuller displayed non-verbal pain symptoms during the test and complained of pain symptoms in his hands. (*Id.*). As a result of this test, the therapist determined Mr. Fuller would have difficulty with job tasks that require fine motor dexterity in a specified amount of time. (*Id.*). Mr. Fuller sat for twenty minutes consecutively and rated his pain 6/10 following the test. (Tr. 1086). He stood for fifteen consecutive minutes, during which he

demonstrated non-verbal displays of pain. (*Id.*). He rated his pain 8/10 after the standing test. (*Id.*). Mr. Fuller was asked to kneel for five consecutive minutes but was only able to kneel for two minutes before terminating the test and rated his pain 7/10. (*Id.*). Mr. Fuller could rise from the kneeling position with the help of a table. (*Id.*).

Repeated step climbing elevated Mr. Fuller's low back pain such that he could complete only three and a half minutes of the five-minute step climbing test. (Tr. 1087). Mr. Fuller's ability to balance on a single leg fell "well below the mean and standard deviation[.]" (Tr. 1088). Mr. Fuller demonstrated difficulty during lifting tests, and due to complaints of elevated lower back pain with lifting, Mr. Fuller was unable to complete those tests. (Tr. 1088-90). He demonstrated mild difficulty with the push-pull test and terminated the test early due to elevated lower back and left lower extremity pain with increased weight. (Tr. 1090). Mr. Fuller performed carrying tasks with moderate difficulty, ambulating with an antalgic gate. (*Id.*). The test was terminated due to elevated lower back and left extremity pain. (*Id.*). Based on testing results, the therapist determined Mr. Fuller could occasionally lift between 21 and 26 pounds, depending on elevation, and occasionally carry sixteen pounds on the left side and twenty-one pounds on the right side; frequently sit; and occasionally stand, walk, climb stairs, balance, kneel, perform tasks using fine motor dexterity, and push and pull twenty pounds. (Tr. 1091).

On May 11, 2021, Mr. Fuller returned to the pain management clinic and reported no improvement following the left L5 and S1 transforaminal epidural steroid injection. (Tr. 1108). The medical provider noted Mr. Fuller rose from a seated position with ease, ambulated with a normal gait, and displayed 5/5 strength bilaterally in the distal lower extremities. (Tr. 1108-09).

### III.  MEDICAL OPINIONS

On January 4, 2021, state agency medical consultant Gerald Kylop, M.D., reviewed Mr. Fuller's medical records and determined Mr. Fuller could work at the light exertional level with additional restrictions, including limitations to occasionally lifting and carrying up to twenty pounds, ten pounds frequently; standing and/or walking for four hours with normal breaks and sitting for four hours with normal breaks, and periodically alternating sitting and standing to relieve pain and discomfort; occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling; frequently balance; never climb ladders, ropes, or scaffolds; and avoid all exposure to hazards such as unprotected heights and dangerous moving machinery. (Tr. 94-95). On January 19, 2021, state agency psychological consultant Deryck Richardson, Ph.D., reviewed Mr. Fuller's records related to mental health issues and adopted the prior ALJ's findings of non-severity. (Tr. 92).

On January 11, 2021, Mr. Fuller attended a psychological evaluation with Thomas Evans, Ph.D. (Tr. 892). After evaluation, Dr. Evans determined Mr. Fuller met the criteria for a diagnosis of unspecified anxiety disorder, though no signs of anxiety were observed during the appointment. (Tr. 894). Mr. Evans opined Mr. Fuller "would not appear to have difficulties understanding, remembering, or carrying out simple to moderately complex instructions in a workplace setting" and "his anxiety symptoms are not to the point that would inhibit his ability to respond to typical workplace stressors." (Tr. 895). Mr. Evans additionally noted Mr. Fuller displayed good attention and concentration and was pleasant and cooperative throughout the evaluation. (*Id.*).

On reconsideration, state agency medical consultant Lynne Torello, M.D., reviewed the initial and updated medical records and adopted Dr. Kylop's findings and opinion. (Tr. 105). State

agency psychological consultant Vicki Warren, Ph.D., reviewed initial and updated records related to mental health issues and adopted Dr. Richardson's opinion. (Tr. 102).

## IV.    ADMINISTRATIVE HEARING

At the hearing before the ALJ, Mr. Fuller testified he served in the United States Navy for 20 years. (Tr. 43). During his last two years with the Navy, Mr. Fuller was a passport agent organizing travel claims. (Tr. 43). Before that, he worked as a loadmaster on a military hovercraft. (*Id.*). Mr. Fuller receives 100% permanent and total disability through Veterans Affairs. (Tr. 48). After his discharge, Mr. Fuller worked at a small start-up company, Intellect Tech, processing disability claims for Veterans Affairs. (Tr. 42). Mr. Fuller's employer accommodated his medical needs by giving him close and free access to the bathroom and allowing him to lie down or stretch as necessary. (Tr. 48).

In January 2020, Mr. Fuller was diagnosed with Still's disease after experiencing two months of symptoms, including high fever and swelling in his ankles and feet. (Tr. 46). Mr. Fuller currently takes methotrexate, prednisone, colchicine, and Humira injections. (Tr. 47). The medications are helpful, but the relief does not last long enough to see him to the next dose. (*Id.*). For instance, he receives a Humira injection every two weeks, but the medication is effective for only a few days. (*Id.*). Mr. Fuller testified he is already prescribed the maximum dosage of Humira. (*Id.*).

Mr. Fuller experiences painful swelling and cramping in his hands and feet. (Tr. 50). This affects his ability to perform fine motor tasks with his hands. (*Id.*). Usually, Mr. Fuller elevates his legs whenever he sits to help alleviate swelling in his feet. (Tr. 52). Mr. Fuller takes methotrexate and Humira, which causes hot flashes and general fatigue. (Tr. 53). He has a history of surgery to

9

his lumbar spine and suffers from back pain. (*Id.*). The surgery helped alleviate numbness but not pain. (*Id.*). Mr. Fuller can reach low-level back pain by doing nothing for several days, but doing anything active triggers recurrence of dull, constant pain. (*Id.*). He experiences occasional back spasms and has balance issues. (*Id.*). Mr. Fuller spends a typical day alternating between sitting, standing, and lying down. (Tr. 52). He watches television, reads, writes, and engages in other small hobbies but cannot enjoy them for long. (*Id.*). Due to the gastrointestinal side effects of medication, Mr. Fuller must be near a restroom, especially after meals. (Tr. 54). He explained he had been to the restroom on multiple occasions, for a total of 45 minutes, between 9:00 a.m. and 1:00 p.m. on the day of the hearing. (*Id.*).

Mr. Fuller estimates he can stand for 10 to 15 minutes before needing to sit; walk with a grocery cart for 20 to 30 minutes but uses a cane for longer unsupported walking, like at the mall; sit for 20 to 30 minutes at a time; and lift 10 to 15 pounds, but not consistently. (Tr. 49, 50). He believes he cannot reliably work a 40-hour a week job due to the swelling in his hands and the discomfort he has with remaining in a seated position for long periods of time. (Tr. 48-49). Mr. Fuller can reach above his head but cannot lift weight above his head due to pain. (Tr. 51).

VE Megan Cameron then testified. She classified Mr. Fuller's past relevant work as maintenance mechanic (DOT #638.281-014, heavy exertion, SVP 7), passport examiner (DOT #169.267-030, light exertion, sedentary as performed by Mr. Fuller, SVP 5), and claims clerk I (DOT #241.362-010, sedentary exertion, SVP 4). (Tr. 57).

**Hypothetical One.** The ALJ asked if a hypothetical individual of Mr. Fuller's age, education, and vocational profile could perform Mr. Fuller's past relevant work if subject to light exertion work under the following restrictions: occasionally climb ramps and stairs; occasionally

stoop, kneel, crouch, and crawl; frequently balance; never climb ladders, ropes, or scaffolds; avoid hazards such as unprotected heights and dangerous moving machinery; avoid extreme temperatures and wetness/humidity; occasionally operate hand controls, such as gear shifts and knobs, with the bilateral upper extremities. (Tr. 58). According to the VE, such an individual could perform as a passport examiner or a claims clerk, but not as a maintenance mechanic. (Tr. 58). The VE identified other jobs the hypothetical individual could work, including mailroom clerk (DOT #209.687-026, SVP 2, estimated 13,000 jobs nationally), cashier II (DOT #211.462-010, SVP 2, estimated 530,000 jobs nationally), and office helper (DOT # 239.567-010, SVP 2, estimated 11,000 jobs nationally). (Tr. 58-59).

**Hypothetical Two.** If additionally limited to simple tasks in a routine work setting but not at a production rate pace, occasional changes in the workplace that are well-explained, and occasional interaction with supervisors, coworkers, and the general public, such an individual would be unable to perform Mr. Fuller's past relevant work and would be unable to perform as a cashier II. (Tr. 59). Other work the hypothetical individual could perform includes price marker (DOT #209.587-034, SVP 2, estimated 130,000 jobs nationally). (*Id.*).

If limited to sedentary work and subject to the restrictions of Hypothetical One, the individual could perform past relevant work as a claims clerk I. (*Id.*). Additionally, the individual could work as a passport examiner as Mr. Fuller performed it, but not as generally performed. (*Id.*). Other work the hypothetical individual could perform includes document preparer (DOT #249.587-018, SVP2, estimated 17,000 jobs nationally), addresser (DOT #209.587-010, SVP 2, estimated 2,100 jobs nationally), and tube operator (DOT # 239.687-014, SVP 2, estimated 2,100 jobs nationally). (Tr. 59-60). If limited to sedentary work and subject to the additional restrictions

11

of Hypothetical Two, the individual could not perform any of Mr. Fuller's past relevant work; however, the individual could perform the document preparer, addresser, and tube operator positions. (Tr. 60).

The VE testified employers expect employees to stay on task 90% of the workday and typically tolerate one absence a month. (*Id.*).

## V.   OTHER RELEVANT EVIDENCE

On December 18, 2020, Mr. Fuller completed an Adult Function Report and provided information about how his conditions limit his ability to work. (Tr. 286-93). With adult-onset Still's Disease (a form of rheumatoid arthritis), Mr. Fuller experiences swelling, edema, pain in his hands and feet, and low-grade fevers. (Tr. 286). He has chronic wrist pain, trouble grasping, and weakness. (*Id.*). This condition limits his ability to walk, stand, sit, and use his hands. (*Id.*). He cannot use his hands for more than 10 minutes at a time for tasks such as writing, cutting food, or using scissors. (*Id.*). Back pain limits him to lifting 5 pounds occasionally. (*Id.*). He cannot do repetitive bending or drive for longer than one hour. (Tr. 288-89). He has knee pain and cannot kneel; the pain increases with standing, walking, and climbing stairs. (Tr. 286). Mr. Fuller also has hip pain. (*Id.*). He uses a cane for ambulation and stability. (*Id.*). When Mr. Fuller completed the Function Report, he was prescribed prednisone, gabapentin (which makes him feel drowsy and loopy), and colchicine (which causes diarrhea and daily gastrointestinal issues). (Tr. 293).

On a typical day, Mr. Fuller gets up and heats up something small for breakfast. (Tr. 287). He reads, does some writing, watches television, uses the computer, eats lunch, engages in crafts and hobbies, naps for 15 minutes to an hour, and has dinner. (*Id.*). He does not craft as much because of the limited use of his hands. (Tr. 290). Mr. Fuller can use his dominant hand for an

activity for 10 minutes, then must stop and rest for 3 to 5 minutes. (Tr. 293). He is not responsible for taking care of the family pet but occasionally fills the water bowl. (Tr. 287). Before his conditions, Mr. Fuller could work full time, play sports, including flag football, exercise, go for long walks, and go camping. (*Id.*). He has difficulty tying his shoes and putting on pants and socks. (*Id.*). He used to prepare full meals but finds food preparation too painful for his hands. (Tr. 288). Mr. Fuller endorses being in the bathroom at least 15 minutes per hour due to gastrointestinal issues. (Tr. 287).

On March 1, 2021, Mr. Fuller updated the Function Report with additional information. (Tr. 306-13). He has shooting pain down his left foot, more weakness in his left knee, and continued swelling in his feet and hands. (Tr. 306). He endorsed trouble grasping bilaterally and has difficulty with buttons, round doorknobs, and the like. (*Id.*). He must take rest breaks during meal preparation and completes daily activities at a much slower pace. (Tr. 308, 310). Mr. Fuller also reported frequent and vivid nightmares that disrupt his sleep and increases his anxiety. (Tr. 307, 312).

### THE ALJ'S DECISION

The ALJ's decision, dated August 31, 2021, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since June 7, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc disease, status post L5-S1 microdiscectomy; obesity; Adult Stills disease; and systemic inflammatory response syndrome. (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: He can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. He can frequently balance. He can never climb ladders, ropes, or scaffolds. He should avoid workplace hazards such as unprotected heights and dangerous moving machinery. He should avoid working in conditions of extreme heat and/or cold or humidity and/or wetness. He can occasionally operate hand controls such as gear shifts and knobs with the bilateral upper extremities.

6.      The claimant is capable of performing past relevant work as a Claims Clerk I DOT #241.362-010, both as generally and as actually performed, and his past work as a Passport Examiner DOT #169.267-030, as actually performed. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from May 3, 2017, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 16-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d

830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial

evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh

the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the

court cannot overturn "so long as substantial evidence also supports the conclusion reached by the

ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a

"zone of choice" within which the Commissioner can act, without fear of court interference.

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150

(8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the

record. Substantiality of evidence must be based upon the record taken as a whole. Substantial

evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v.

Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the

record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own procedures

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Fuller asserts two errors related to the ALJ's residual functional capacity assessment. First, the ALJ found the physical therapist's residual functional evaluation generally consistent and supported by the overall evidence but ignored the opinion that Mr. Fuller is limited to occasional fine motor dexterity and provided no rationale for the discrepancy. (Pl.'s Br., ECF #8, PageID 1192). He claims this is not harmless error because there is no evidence Mr. Fuller can perform past relevant work or any other work if he is also limited to occasional fingering and less than occasional handling. (*Id.* at PageID 1193). Relatedly, Mr. Fuller claims the ALJ erred in the analysis of his subjective statements about his symptoms, specifically the pain in his hands and wrists; Mr. Fuller's consistent reports to medical providers of pain in his hands are similar to his statements at the administrative hearing and consistent with the reliable testing performed by the physical therapist and the ALJ failed to consider the effectiveness and side effects of medication. (*Id.* at PageID 1195, 1197).

The Commissioner responds the ALJ did not err in the assessment of the physical therapist's residual functional evaluation; moreover, even if the ALJ did err by not providing a limitation to occasional fine manipulation, Mr. Fuller could still perform as a tube operator, which, according to the Dictionary of Occupational Titles (DICOT), requires occasional fingering, or fine manipulation. (Comm'r's Br., ECF #11, PageID 1213-14). The Commissioner also asserts the ALJ reasonably evaluated Mr. Fuller's symptoms and "discussed the location, duration,

17

frequency, and intensity of [his] pain (citing pain levels) and other symptoms, precipitating or aggravating factors, medications, court of treatment, other methods used to relieve pain, and daily activities." (*Id.* at PageID 1218-19).

The residual functional capacity assessment, left solely to the ALJ's determination, is what an individual can still do despite his limitations. Social Security Ruling (SSR) 96-8p, 1996 WL 374184; *see also* 20 C.F.R. § 404.1546(c). It is an administrative assessment of the extent to which an individual's medically determinable impairments, including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities. SSR 96-8p. The assessment must address the remaining exertional and nonexertional capacities of the individual. *Id.* Exertional capacity addresses limitations of physical strength and defines the individual's abilities to perform the strength demands of sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id.* The ALJ must consider these capacities separately. *Id.* Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength, including all physical limitations that are not reflected in the strength demands, and mental limitations. *Id.* It assesses postural, manipulative, visual, communicative, and mental activities. *Id.* The ALJ must also consider these nonexertional capacities separately. *Id.* The assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. *Id.*

## A.    The ALJ erred in the evaluation of the physical therapist's opinion.

In this case, the ALJ found the physical therapist's opinion to be generally persuasive:

The opinion is generally consistent with and supported by the overall evidence. The undersigned finds that it supports a limitation to work at the sedentary exertional

18

> level with additional postural and environmental limitations as set forth in the above residual functional capacity assessment, including a limitation to occasional operation of hand controls with the bilateral upper extremities, consistent with [the physical therapist's] examination findings documenting some limitation in use of the hands. Accordingly, this opinion is found generally persuasive.

(Tr. 26).

According to SSR 85-15, reaching, handling, fingering, and feeling require progressively finer usage of the upper extremities to perform work related activities. SSR 85-15; 1983-1991 Soc. Sec. Rep. Serv. 343. Handling (gross manipulation) refers to seizing, grasping, turning, or otherwise working primarily with the whole hand, whereas fingering (fine manipulation) involves picking, pinching, or otherwise working primarily with the fingers. *Id.* The ALJ's specific limitation to occasional operation of hand controls is a limitation that addresses handling, not fingering. The tests performed during the physical therapist's evaluation revealed significant findings related to grip strength, which the ALJ accounted for by limiting his use of hand controls. (Tr. 26; *see also* ECF #11, PageID 1212-13). But testing also revealed significant fine manipulative limitations, leading the physical therapist to opine that Mr. Fuller can occasionally perform tasks requiring fine motor dexterity.

The ALJ acknowledged the test results placed Mr. Fuller in the third percentile or below but did not adopt a limitation addressing fine manipulation or acknowledge the physical therapist's opinion that he is limited to occasional fine motor dexterity and did not articulate why such a limitation was unsupported or inconsistent with the record. (Tr. 24). It is well established that an ALJ need not adopt all findings in a medical opinion. *See Fiktus v. Kijakazi*, No. 1:20CV1689, 2021 WL 5567866 (N.D. Ohio Apr. 25, 2022), *report and recommendation adopted*, 2022 WL 1422838 (N.D. Ohio May 5, 2022). Although there is no requirement that the ALJ

adopt opinions he finds persuasive "verbatim," the ALJ must explain why he did not adopt a portion of the opinion if the residual functional capacity conflicts with it. *Kearns v. Comm'r of Soc. Sec.,* No. 3:19 CV 01243, 2020 WL 2841707, *13 (N.D. Ohio Feb. 3, 2020), *report and recommendation adopted,* 2020 WL 2839654 (N.D. Ohio Jun 1, 2020). The Commissioner does not point to any explanation why the ALJ did not include a limitation regarding fine manipulation anywhere in the decision. As a result, I conclude the ALJ failed to build a logical bridge between the physical therapist's opinions and the residual functional capacity.

The Commissioner argues whether the ALJ's wording is equivalent to the physical therapist's wording has little practical impact on the outcome of the case because even if the ALJ specifically limited Mr. Fuller to occasional fine motor dexterity, he can still perform other work as a tube operator, which requires occasional fingering. (ECF #11 at PageID 1213-14). First, as demonstrated above, the limitation to occasional operation of hand controls addresses issues with gross manipulation and is not equivalent to a limitation addressing issues with fine manipulation. Moreover, while the ALJ states the tube operator position requires occasional fingering, the record is silent on this point. Indeed, the ALJ did not pose hypotheticals for the VE that incorporated a limitation to occasional fine manipulation or fingering. Had the ALJ posed a hypothetical incorporating such a limitation in addition to the handling limitation, the VE could conceivably have reached different conclusions than she did. In turn, the ALJ's decision may possibly have been different. Because the VE was not questioned regarding this limitation, I conclude this error was not harmless. *See Miley v. Comm'r of Soc. Sec.,* No. 2:19-CV-3206, 2020 WL 1180730, at *6 (S.D. Ohio Mar. 12, 2020), *report and recommendation adopted,* 2020 WL 1434460 (S.D. Ohio Mar.

24, 2020) (stating that the court could not find that the error was harmless where the VE had not been questioned on the specific limitation).

Based on the foregoing finding of nonharmless error, I recommend the District Court remand the matter to the Commissioner with instructions consistent with this Report and Recommendation.

**B.    The ALJ properly evaluated Mr. Fuller's symptoms.**

In all cases in which symptoms, such as pain, are alleged, the assessment must "contain a thorough discussion and analysis of the objective medical evidence and other evidence, including the individual's complaints of pain and other symptoms...; include a resolution of any inconsistencies in the evidence as a whole; and set forth a logical explanation of the effects the of symptoms, including pain, on the individual's ability to work." SSR 85-15p. The ALJ must also discuss why symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. *Id.*

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including:

- a claimant's daily activities;
- the location, duration, frequency, and intensity of pain or other symptoms;
- factors that precipitate and aggravate the symptoms;
- the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

- treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
- any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
- any other factor concerning the claimant's functional limitations and restrictions due to pain and other symptoms.

20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p. The ALJ is not required to analyze all seven factors, only those that are germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence."). The ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. SSR 16-3p.

The ALJ is not required to accept the claimant's subjective complaints and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the ALJ evaluated the individual's symptoms. SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing–an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of

22

the claimant's subjective complaints or the conclusions drawn from them. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ stated:

While the claimant has medically determinable impairments that could reasonably cause some of the symptoms and limitations, the allegations are considerably broader and more restricted than is established by the medical evidence. This is not to say that the claimant is symptom free or does not experience difficulty performing some tasks. The evidence does establish some limitations with respect to the claimant's physical abilities. However, the record does not support the severe degree of limitation alleged. In sum, the claimant's physical impairments and obesity prevent him from performing work at greater than the sedentary exertional level, with additional limitations on climbing and performing other postural movements, and limitations on environmental exposure and exposure to workplace hazards such as unprotected heights and dangerous moving machinery. Further, he has been limited to occasional operation of hand controls with the bilateral upper extremities. Accordingly, the undersigned finds that the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded the claimant from performing all work on a regular and continuing basis at any time June 7, 2019 through the date of this decision. Nevertheless, the claimant's impairments as a whole have all been accommodated for within the residual functional capacity assessment set forth above (SSR 16-3p).

(Tr. 26). Elsewhere, the ALJ acknowledged Mr. Fuller's complaints that using his hands for fine motor tasks such as his phone or computer causes cramping and pain and the consistent complaints to medical providers of hand pain. (Tr. 22, 24).

The Commissioner asserts the ALJ relied on evidence of improvement to discount Mr. Fuller's complaints of hand pain, including medical records from August 2020 when Mr. Fuller rated his pain at 5/10 and described himself as only "mildly uncomfortable," and from February 2020 when his subjective report of pain decreased to 3-4/10, evidence suggesting Mr. Fuller's symptoms were not particularly adverse. (ECF #11 at PageID 1219). An individual's improvement

23

is a valid reason to discount subjectively reported symptoms. *See e.g., Conversino v. Comm'r of Soc. Sec.*, No. 5:19 CV 2726, 2020 WL 7232142, *9 (N.D. Ohio Nov. 17, 2020), *report and recommendation adopted*, 202 WL 7231374 (N.D. Ohio Dec. 7, 2020).

While Mr. Fuller's complaints of hand pain are consistent with the evaluation and report of the physical therapist, the ALJ acknowledged this evidence and weighed it against statements that Mr. Fuller made to other medical providers that are inconsistent with the severity of his alleged pain. Moreover, contrary to Mr. Fuller's assertion, the ALJ did consider other relevant factors, including the effectiveness and side effects of the medication. Specifically, the ALJ acknowledged Mr. Fuller's assertion that his medications help with the symptoms but do not last as long as he needs and that he suffers from diarrhea as a side effect of his medication. (Tr. 22). The ALJ's findings of improvement, discussed above, are arguably inconsistent with Mr. Fuller's statement as to the effectiveness of his medications. The ALJ acknowledged Mr. Fuller suffers from diarrhea as a medication side effect but weighed this against Mr. Fuller's statement that Metamucil was helping his gastrointestinal symptoms. (Tr. 22, 24).

It is clear from the decision as a whole that the ALJ considered the relevant factors when analyzing Mr. Fuller's subjective reports of pain. While the district court may disagree with the ALJ's ultimate conclusions, it is the ALJ who is tasked with weighing the evidence. *See Brainard*, 889 F.2d at 681 (6th Cir. 1989) (noting that the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence). Mr. Fuller has not identified a compelling reason to disturb the ALJ's analysis on this issue.

* * *

24

While the ALJ did not err in analyzing Mr. Fuller's subjectively reported symptoms, the ALJ's failure to build a logical bridge between the physical therapist's opinion and the residual functional capacity assessment is error necessitating remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner erred in his decision denying disability insurance benefits. I therefore recommend the ALJ's decision be **REVERSED and REMANDED** with instructions consistent with this Report and Recommendation.

Dated: January 4, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific**

objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).